**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**BENNY MARSHALL KING,**

      **Petitioner,**

**v.**                                        **Case No. 2:12cv81**
                                                  **(Judge Bailey)**

**PAT MIRANDY, Warden,**

      **Respondent.**

## AMENDED[1] REPORT AND RECOMMENDATION

On November 28, 2012, Benny Marshall King, the *pro se* petitioner, a former inmate at the St. Mary's Correctional Center ("SMCC") in St. Mary's, West Virginia,[2] filed an Application for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, along with a motion for leave to proceed *in forma pauperis* ("IFP") and a motion to appoint counsel.[3] After receiving a Notice of Deficient pleading, petitioner paid the filing fee and his motion for *in forma pauperis* status was terminated.

On December 11, 2012, the Court made a preliminary review of the petition, found that summary dismissal was not warranted, and directed the respondent to answer the petition.[4] After being granted three extensions of time, on April 10, 2013, the respondent filed a response, along with a Motion for Summary Judgment, a Motion for Leave to File Over-Length Document, and a Motion to Seal Respondent's Reference List for Redacted Personal Data Identifiers. By Order entered the following day, the respondent's Motion for Leave to File Over-Length Document and his Motion to Seal were granted. Because the petitioner was proceeding *pro se*, on April 11, 2013, a <u>Roseboro</u> Notice was issued. After

---

[1] This Report and Recommendation is being amended solely to correct a typographical error in the date of sentencing, on page 3.

[2] Petitioner completed his sentence and was released from SMCC or about February 10, 2013.

[3] By Order entered December 3, 2012, petitioner's motion for court-appointed counsel was denied. Petitioner later filed a motion for reconsideration of that Order, which was denied as well, by Order entered January 2, 2013.

[4] An Amended Order directing the respondent to answer was later entered, to correctly reflect the date petitioner's reply was due.

being granted three extensions of time, on August 26, 2013, petitioner filed his response in opposition to the respondent's dispositive motion, along with a Motion for Leave to File Over-Length Document. By Order entered the following day, petitioner's Motion for Leave to File Over-Length Document was granted.

Accordingly, this case is before the undersigned for a report and recommendation pursuant to LR PL P 2.

## I. Factual and Procedural Background

### A. Background

Petitioner, a resident of Paw Paw, in Morgan County, West Virginia, married the mother of the child victim in this case when the child was approximately six years old. On or about April 23, 2002, petitioner received an extremely graphic, sexually explicit letter,[5] dated April 23, 2002, from the victim, then 14 years old, describing their sexual activity together, clearly referencing a sexual relationship between the two that had been ongoing for quite some time. The victim wrote the letter at school, brought it home and put it in petitioner's pants pocket for him to read. Petitioner apparently read the letter and put it back in his pocket where his wife, already suspicious of a sexual relationship between her daughter and husband, found it several days later and turned it in to her daughter's school. The school turned the letter over to the West Virginia Department of Health and Human Resources ("DHHR"). After investigating the issue, the DHHR notified the West Virginia State Police ("WVSP"), who launched the criminal investigation. On April 27, 2002, the WVSP sent an officer out to the home to interview the family. The victim, upon being questioned and confronted with a copy of her April 23, 2002 letter, admitted having had sex with her stepfather at least three times between March and April, 2002. Some months later, she later recanted the allegations, claiming she had only written the letter to scare her alcoholic father into stopping drinking, purportedly because she thought if he believed he had hurt one of

---

[5] Dkt.# 34-13 at 43 – 44.

his children while drunk, he would be "scared sober."  At trial, she testified as a hostile witness for the State, steadfastly insisting that "nothing" had happened between her and her stepfather.

**B.   Petitioner's Conviction and Sentence**

During its September, 2002 term, the Morgan County, West Virginia Grand Jury returned a nine-count indictment charging petitioner with three counts of Sexual Abuse by a Parent, Guardian or Custodian (Counts 1, 4, and 6), in violation of W. Va. Code § 61-8D-5; three counts of Incest (Counts 2, 5, and 8), in violation of W. Va. Code § 61-8-12(b); and three counts of Third Degree Sexual Assault (Counts 3, 6, and 9), in violation of W. Va. Code § 61-8B-5.[6]

At trial, petitioner was represented by attorneys Thomas Stanley and Patrick LeFebure. After a two-day trial, on April 9, 2003, petitioner was convicted on all nine counts.[7]

At a May 22, 2003 hearing, petitioner was sentenced. Before addressing any sentencing issues, the trial court took up petitioner's post-trial motions for a judgment of acquittal and a new trial, ultimately denying both.[8] After considering the pre-sentence report and arguments of counsel, petitioner was sentenced to not less than ten nor more than twenty years on Counts 1, 4, and 7; not less than 5 nor more than fifteen years on Counts 2, 5, 8; and to not less than one nor more than five on Counts 3, 6, and 9. All of petitioner's sentences were ordered to run concurrently, giving him an actual combined total sentence of not less than ten nor more than twenty years.[9] Because he received credit for time already served, the effective date of petitioner's sentencing was January 11, 2003.[10]

---

[6] Dkt.# 34-1.

[7] Dkt.# 34-2 and Dkt.# 34-3.

[8] Dkt.# 34-14 at 10 - 11.

[9] Sentencing Order, Circuit Court of Morgan County, W.Va., Dkt.# 34-3.

[10] Dkt.# 34-3 at 4-5, Dkt.# 34-14 at 20 – 21.

Petitioner was released from custody on February 10, 2013. He is not on parole.[11] However, as a convicted sex offender, he is subject to lifetime supervision,[12] pursuant to West Virginia's Sex Offender Registration Act, as set forth in W. Va. Code § 15-12-1 *et seq.*

## B. **Direct Appeal**

Through counsel, petitioner filed a notice of intent to appeal on June 12, 2003.[13] By agreed Order entered October 30, 2003, the trial court re-set the deadline for petitioner to file his petition for appeal. On January 29, 2004, petitioner's appellate counsel filed the petition with the West Virginia Supreme Court of Appeals ("WVSCA") asserting the following assignments of error:

1. Did the trial court commit error by failing to grant the defendant's motion for judgment of acquittal at the close of the prosecution's case in chief?

2. Did the trial court commit error by admitting character evidence about the defendant under the guise of permissible use for a specific purpose under W.Va. R. Evid. 404(b)?

3. Did the trial court commit error by permitting the prosecution to impeach the victim, pursuant to W. Va. R. Evid. 607?

4. Did the trial court abuse its discretion by failing to exclude irrelevant and/or prejudicial evidence pursuant to W. Va. R. Evid. 403?

5. Did the prosecution's closing remarks to the jury rise to the level of misconduct, requiring reversal of the conviction?

Petition of Appellant, Dkt.# 34-4 at 13.

By Order entered May 6, 2004, the WVSCA refused petitioner's direct appeal.[14] Petitioner did not petition for writ of *certiorari* to the Supreme Court.

## C. **Petitioner's State Habeas Petition**

---

[11] Dkt.# 34-18 at 2.

[12] Dkt.# 34-14 at 22.

[13] Appellate counsel first erroneously filed petitioner's notice of appeal in the Circuit Court of Berkeley, rather than Morgan County.

[14] Dkt.# 34-4 at 2.

On January 4, 2005, petitioner, proceeding *pro se,* filed a petition for post-conviction relief under W. Va. Code § 53-4A-1(a) in the Circuit Court of Morgan County, raising the following grounds for relief:

1. appellate counsel was ineffective.

2. The prosecution made improper remarks during closing arguments to the jury.

3. The trial court erred in admitting 404(b) evidence without first conducting proper *in camera* hearing under McGinnis.[15]

Dkt.# 34-5.

Along with his habeas petition, petitioner also filed a Losh[16] checklist, a motion to appoint counsel, and a pauper's affidavit. By order entered January 28, 2005, the state habeas court granted petitioner's motion for counsel, appointing attorney Nicholas F. Colvin, instructing him to file an amended petition to include any additional meritorious grounds for relief. After numerous court-sanctioned delays, on October 7, 2010, Attorney Colvin filed an amended state petition for post-conviction relief with a memorandum of law, raising the following grounds for relief:

**1.** trial counsel was ineffective because

    **a)** there was a complete breakdown in communication between petitioner and counsel, and counsel failed to follow up on two motions to withdraw;

    **b)** the public defenders' office failed to provide petitioner an adequate defense, including the hiring of experts, due to financial constraints;

    **c)** no witnesses were called on petitioner's behalf at trial;

    **d)** no independent DNA samples or other medical testing was obtained;

    **e)** counsel failed to move for independent psychological evaluation of the alleged victim;

    **f)** counsel was medically ill during the pre-trial period, and thus did not render a vigorous defense;

---

[15] State v. McGinnis, 193 W.Va. 147, 455 S.E.2d 516 (W.Va. 1994).

[16] Losh v. McKenzie, 166 W.Va. 762, 277 S.E.2d 606 (1981).

**g)** counsel failed to file a W.Va. R. Crim. Pro. 35(b) motion for reconsideration of petitioner's sentencing, as requested, and was dilatory in filing a notice of appeal; further, counsel filed the notice of appeal in the wrong county;

**h)** counsel conducted improper *voir dire;*

**i)** counsel failed to object to the defective indictment, and failed to request a bill of particulars to clarify the indictment, leaving petitioner to speculate and guess as to what conduct he had purportedly committed.

**2.** Petitioner was denied the right to a speedy trial.

**3.** Because of his severe substance abuse, petitioner's mental competency was compromised, which affected his criminal responsibility or lack thereof, and his ability to assist counsel in the preparation of his defense.

**4.** The exculpatory evidence of the alleged victim's recanting to the State her story of abuse, was impermissibly withheld from petitioner.

**5.** The State's impeachment techniques used on its own witness/alleged victim were impermissible pursuant to W. Va. R. Evid. 607, and the letter purportedly drafted by the alleged victim was admitted in error.

**6.** Petitioner's right to bail was revoked without sufficient cause.

**7.** The trial court committed reversible error by permitting the State to present evidence via W. Va. R. Evid. 404(b).

**8.** The State committed reversible error by misquoting the evidence in the matter *sub judice* to the petit jury in closing argument.

**9.** The evidence was insufficient to warrant a conviction and a judgment of acquittal should have been ordered.

**10.** Petitioner received a far more severe sentence than expected.

**11.** Petitioner's sentence was excessive.

**12.** Venue, a necessary element of the crimes charged, was not proven by the State of West Virginia.

**13.** The cumulative effect of all errors committed and adverse rulings made at trial violated petitioner's rights to due process and fundamental fairness.

**14.** The indictment was defective because it did not adequately differentiate the charges, but merely recited duplicative boilerplate language, preventing petitioner from properly asserting a defense.

**15.** Additional grounds for relief are:

**a)** the trial court lacked jurisdiction;

**b)** the verdict form was erroneous and improper sentencing [occurred];

**c)** the indictment contained a multiplicity of charges that lacked specificity;

**d)** the lack of specificity of the charges caused double jeopardy and impaired petitioner's defense;

**e)** petitioner was denied access to the Grand Jury minutes, impairing his ability to present additional grounds for his defense;

**f)** trial counsel failed to move for a bill of particulars to clarify the indictment;

**g)** prosecutorial misconduct occurred;

**h)** petitioner was denied access to exculpatory evidence;

**i)** the State knowingly used the perjured testimony of the alleged victim;

**j)** the Grand Jury's composition was compromised;

**k)** the indictment was defective because it lacked specificity; and

**l)** the State falsified documents to "obtain an advantage upon" petitioner.

Dkt.# 34-6.

The state habeas court convened an omnibus evidentiary hearing on January 13, 2011.[17] By Memorandum Opinion entered August 5, 2011, the state habeas court denied all of petitioner's grounds for relief.[18]

**2. State Habeas Appeal to the WVSCA**

Petitioner appealed the denial of his amended state habeas petition to the WVSCA on December 6, 2011, alleging all of the same grounds previously alleged in the state habeas court, but prefacing them with a new Ground One, claiming that

**1.** The lower court failed to adhere to the statutory requirements laid out in W. Va. Code § 53-4A-7 by: not providing specific findings of fact and conclusions of law relating to contentions and grounds

---

[17] Dkt.# 34-10.

[18] Opinion Order Refusing Petition for Writ of Habeas Corpus Ad Subjiciendum, Dkt.# 34-7.

advanced, not clearly stating the grounds upon which the matter was determined, and by not stating whether a federal and/or state right was preserved and decided.[19]

By Memorandum Decision entered October 22, 2012, the WVSCA denied the appeal of petitioner's state habeas petition.[20]

**D.  Petitioner's Federal Habeas Petition (Dkt.# 1)**

On November 28, 2012, petitioner filed the instant petition, again alleging the same 15 grounds with their subparts, originally raised in his amended state habeas petition, *supra,* and seeking "acquittal of all convictions with prejudice" as relief.

**E.  Respondent's Motion for Summary Judgment (Dkt.# 34)**

The respondent contends that

1. the petition asserts claims not cognizable in federal habeas corpus;

2. petitioner has failed to state a claim upon which relief can be granted; and

3. he has failed to demonstrate that he is entitled to relief on any of his claims.

**F. Petitioner's Response to Respondent's Motion for Summary Judgment (Dkt.# 53)**

Without attempting to address any of the arguments raised in the respondent's summary judgment motion, petitioner merely re-filed same memorandum of law he attached to his instant habeas petition.[21]

## II.  Standard of Review

**Motion for Summary Judgment**

The Supreme Court has recognized the appropriateness of Rule 56 summary judgment motions in habeas cases. See Blackledge v. Allison, 431 U.S. 63, 80 91977). So too, has the Fourth Circuit Court of Appeals. Maynard v. Dixon, 943 F.2d 407 (4th Cir. 1991). Pursuant to Rule 56c of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to

---

[19] Dkt.# 34-6.

[20] See Benny K. v. Plumley, Warden, Dkt.# 34-9.

[21] That memorandum of law is a partial copy of petitioner's brief in support of his amended state habeas petition, which is also the same brief he submitted on appeal of that petition to the WVSCA, albeit with a different Ground One claim (no longer being raised here), and some pages shuffled in a different order than they were originally presented to the WVSCA.

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

Motions for summary judgment impose a difficult standard on the moving party; for it must be obvious that no rational trier of fact could find for the nonmoving party. Miller v. Federal Deposit Ins. Corp., 906 F.2d 972, 974 (4th Cir. 1990). However, the "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242-252 (1986). To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]." (Id) "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987). Such evidence must consist of facts which are material, meaning that they create fair doubt rather than encourage mere speculation. Anderson, 477 U.S. at 248. It is well recognized that any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Industrial Co. V. Zenith Radio Corp., 475 U.S. 574, 587-88 1986).

### III.  Analysis

**Federal Habeas Review Under 28 U.S.C. § 2254**

Notwithstanding the standards which govern the granting of a motion for summary judgment, the provisions of 28 U.S.C. § 2254 must be examined to determine whether habeas relief is proper.  Title 28 U.S.C. § 2254 requires a district court to entertain a petition for habeas corpus relief from a prisoner in State custody, but "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Regardless, "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A).  However, the federal court may not grant habeas relief unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

28 U.S.C. § 2254(d)(1) and (2); see also Williams v. Taylor, 529 U.S. 362 (2000).

The Fourth Circuit Court of Appeals has determined that "the phrase 'adjudication on the merits' in section 2254(d) excludes only claims that were not raised in state court, and not claims that were decided in state court, albeit in a summary fashion." Thomas v. Taylor, 170 F.3d 466, 475 (4th Cir. 1999). When a state court summarily rejects a claim and does not set forth its reasoning, the federal court independently reviews the record and clearly established Supreme Court law. Bell v. Jarvis, 236 F.3d 149 (4th Cir.) cert. denied, 524 U.S. 830 (2001)(quoting Bacon v. Lee, 225 F.3d 470, 478 (4th Cir. 2000)). However, the court must still "confine [its] review to whether the court's determination 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" Id. at 158.

A federal habeas court may grant relief under the "contrary to" clause "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently that this Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413. A federal court may grant a habeas writ under the "unreasonable application" clause, "if the state court identifies the correct governing legal principle from the Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. "An unreasonable application of federal law is different from an incorrect application of federal law." Id. at 410.

When a petitioner challenges the factual determination made by a state court, "federal habeas relief is available only if the state court's decision to deny post-conviction relief was 'based on an unreasonable determination of the facts.'" 28 U.S.C. § 2254(d)(2). In reviewing a state court's ruling on post-conviction relief, "we are mindful that 'a determination on a factual issue made by a State court shall

be presumed correct,' and the burden is on the petitioner to rebut this presumption 'by clear and convincing evidence.'" <u>Tucker v. Ozmint</u>, 350 F.3d 433, 439 (4th Cir. 2003).

However, habeas corpus relief is not warranted unless the constitutional trial error had a "substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993); <u>Richmond v. Polk</u>, 375 F.3d 309 (4th Cir. 2004). "Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" <u>Brecht</u>, <u>supra</u>.

Because petitioner has raised so many grounds for relief, thirty-four in all, with multiple subparts to many of those, to the extent possible, the Court has attempted to address them in the numerical fashion that petitioner raised them. However, in the interest of clarity and expediency, given the size of the record and the repetitive nature of petitioner's claims, the grounds will be grouped and analyzed accordingly.

## 1. <u>Ineffective Assistance of Counsel</u>

Petitioner contends that his counsel was ineffective for many reasons.

When a petitioner brings an ineffective assistance of counsel claim, counsel's conduct is measured under the two-part analysis in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." <u>Id</u>. at 687. "Deficient performance is not merely below-average performance; rather, the attorney's actions must fall below the wide range of professionally competent performance." <u>Griffin v. Warden, Maryland Corr. Adj. Ctr.</u>, 970 F.2d 1355, 1357 (4th Cir. 1992).

Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. In order to demonstrate prejudice, petitioner must show that but for his attorney's errors, the result of the proceeding would have been different. <u>Strickland</u>, 466 U.S. at 687. Error by counsel which falls short of the constitutional ineffectiveness standard does not constitute cause,

notwithstanding that the error may arise from inadvertence, ignorance, or strategic choice. <u>Murray v. Carrier</u>, 477 U.S. 478 (1986).

Moreover, as the Court has made clear, this review is done through the lens of § 2254, as modified by the Anti-Terrorism and Effective Death Penalty Act (AEDPA). In looking at ineffective assistance claims through this lens,

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below <u>Strickland</u>'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a <u>Strickland</u> claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of §2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." A state court must be granted a deference and latitude that are not in operation when the case involves review under the <u>Strickland</u> standard itself.

<u>Harrington v. Richter</u>, 131 S. Ct. 770, 785 (2011) (internal citation omitted).

Congress intended for AEDPA to raise the bar for relief in a §2254 case because it deals with claims that have already been litigated in state court. <u>Id</u>. at 786. Accordingly, "even a strong case for relief does not mean that state court's contrary conclusion was unreasonable. <u>Id</u>. (citing <u>Lockyer</u>, 538 U.S. at 71).

**1(a): There was a complete breakdown in communication between petitioner and counsel, and counsel failed to follow up on two motions to withdraw.**

Petitioner contends that: trial counsel never responded to his letters; despite his numerous requests to counsel to discuss his case after his bond was revoked,[22] counsel only saw him briefly for a few visits between January 17, 2003 and trial; did not advise him of his trial date until less than twenty-four hours before trial began; did not explain even the most basic trial procedures and strategies before trial; did not speak to him until the day of trial; and before trial, never advised petitioner as to his right to testify or not, leaving him confused about which option to choose. Finally, petitioner contends that despite the breakdown in communication, counsel inexplicably withdrew two motions to withdraw as counsel.

---

[22] Bond was revoked January 10, 2003; petitioner was taken into custody the following day. <u>See</u> Dkt.# 1-1 at 4.

In dealing with these kinds of claims, "a court must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonably professional assistance." Harris v. United States, No. 2:08cv79, 2009 WL 6057204, at *10 (N.D. W.Va. Nov. 5, 2009)(citing Strickland, 466 U.S. at 689-90). There are no absolute rules for determining what is reasonable performance. Hunt v. Nuth, 57 F.3d 1327, 1332 (4th Cir. 1995) (counsel's representation is assessed according to the facts of the particular case and at the time of counsel's conduct).

At petitioner's state habeas omnibus evidentiary hearing, petitioner admitted that: he first met with counsel in his office approximately a week and a half after arraignment;[23] spoke with counsel for 10-15 minutes before every hearing;[24] at his request, counsel stopped by his workplace to speak with him once, but arrived after petitioner had left for lunch;[25] counsel filed a motion or objection challenging the indictment but the judge promptly "ended it;"[26] sometimes counsel met with him in person and sometimes they had phone conversations;[27] counsel spoke with him by phone at the jail several times after his bond was revoked;[28] counsel discussed the State's plea offer with him;[29] they discussed potential witnesses for trial;[30] and that upon his receiving another letter from the child victim before trial in January, 2003, when he called counsel right away, counsel immediately sent his investigator over to the jail to retrieve the letter.[31]

---

[23] Dkt.# 34-10 at 31.  Arraignment was September 26, 2002. See Dkt.# 1-1 at 3.

[24] Id. at 31, 49 – 50.

[25] Id. at 41.

[26] Id. at 46 – 47.

[27] Id. at 49.

[28] Id.  at 32.

[29] Id.

[30] Id. at 32- 35.

[31] Id. at 52 – 53.

At petitioner's state habeas omnibus evidentiary hearing, counsel testified that

As I sit here today, and let me say this for the record, I've had many, many discussions with Mr. King prior to trial and during trial, plus I had many discussions with a couple of his relatives sitting in the gallery today concerning this case.[32]

. . . I met with Mr. King. I can't tell you how many times I met with him, and not just me, Mike McLaughlin my investigator. It was a regular trip to the jail to meet with Mr. King. And I'd have [child victim] in the office and talked to her. Then the next day we would go out to the jail and talk to Benny, telling him what we found out and, you know, "what do you know about this? Is this correct? Things like that.[33]

. . . I spent a lot of time. I don't have a record today of how many times I went to the jail. I'm not even sure the jail has that record to this day. I don't know . . . what their record retention policy is, but if I went a week without going to the jail to see Mr. King or sending Mr. McLaughlin, that would be a rare occurrence. . . And when [child victim] would come to the office we'd block off a whole afternoon, spend three, four, five hours going through the testimony with her and Misty. Plus we had meetings with other potential witnesses. And frankly I don't see how I could have spent any more time on Mr. King that would have made any difference.[34]

At no time pretrial or during trial did petitioner ever alert the trial court that counsel was not keeping him informed; at no time during the omnibus evidentiary hearing did petitioner ever dispute counsel's testimony regarding the amount of their pre-trial and trial communications as false. Moreover, a review of the state court criminal docket reveals that trial counsel filed numerous motions, appeared at multiple hearings, participated in telephone conferences, conducted discovery, and vigorously investigated and defended petitioner's case.[35] Petitioner has not proven ineffectiveness, let alone prejudice. Moreover, his claim that counsel "did not speak to him until the day of trial" is unsupported by the record and lacks merit.

As for counsel's alleged failure to advise petitioner of his right to testify, at the end of the first day of trial, after the jury had left for the day, the court thoroughly and meticulously advised petitioner, in

---

[32] Dkt.# 34-11 at 35.

[33] Dkt.# 34-11 at 38.

[34] Dkt.# 34-11 at 60.

[35] See Dkt.# 1-1 at 3 – 8.

an exchange spanning five pages of trial transcript, of the pros and cons of taking the stand versus

remaining silent.  In the middle and at the end of that discussion, these exchanges were had:

> THE COURT:  I think it would be unfair of me to require an answer of you right now on that because the State is still in their case in chief and you don't have to let them know whether you are going to testify or not. You have the right to keep that secret. I am not going to ask you to say that but I would ask, **do you understand all of the rights?**
>
> THE DEFENDANT: **Yes, I do understand**.
>
> THE COURT:  **Any well-advised criminal Defendant is going to be talking closely with their expert counsel that has been appointed to represent him, and you have two lawyers so I am assuming you are discussing the pros and cons of your testimony with them, is that a safe assumption?**
>
> THE DEFENDANT:  **Yes, sir.**
> . . .
> THE COURT: . . .Now, when you stand up when your case in chief starts that is going to be your opportunity, that is going to be when you either are going to continue remaining silent or going to testify. . . . what I really need to know is that if  you want to, if you want to testify in this case, guarantee to me that you will ask me to get up on the stand, if you do I will let you get on the stand?
>
> THE DEFENDANT: If I decide I want to testify, I will let you know, sir.
>
> THE COURT: Okay.  If you don't personally want to testify will you guarantee to me that you won't get up on the stand even if your lawyers are recommending it if you don't want to?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: So I will be safe in assuming.
>
> THE DEFENDANT:  It will be my own judgment.
>
> THE COURT: I will be safe in assuming whether you get on the stand or whether you remain off of the stand is going to be totally a reflection of your personal wishes?
>
> THE DEFENDANT: Yes.

Trial Transcript, Dkt.# 59-1 at 211 – 216. (emphasis added).

Clearly, despite petitioner's later habeas claims to the contrary, counsel had already him advised

regarding his right to testify or remain silent.  Nonetheless, even if counsel had failed to, the Court so

advised him, thus petitioner can prove no prejudice.  Having suffered no prejudice, he is not entitled to

relief.

Finally, petitioner claims counsel had a conflict with two State witnesses, yet inexplicably, withdrew his motions to withdraw as to each.   The state habeas court's opinion does not address this issue and the WVSCA likewise did not specifically address this claim in its Memorandum Decision, although it found no error.   A review of the record indicates counsel filed the motions to withdraw after learning of potential conflicts with Brian Keith Smith ("Smith") and Sabrina Adams ("Ms. Adams"). Smith had been previously represented by someone else in the Public Defender's office on a juvenile matter; trial counsel had never represented or even spoken to him; and had only just learned Smith might be a witness a few days earlier.   Because counsel had no idea what Smith's testimony might be, he filed the motion to withdraw out of caution.[36]   At the March 7, 2003 pretrial hearing on the matter, the prosecutor advised the Court that she was not certain Smith would be called, but assured the Court that if he were, she anticipated his testimony would not be in regards to a "major issue," and she foresaw no possibility of conflict regarding trial counsel, even under a "worst case scenario," if counsel had to go for Smith's "jugular."[37]   Accordingly, counsel withdrew the "Smith" motion to withdraw.[38]

Ms. Adams, a licensed clinical social worker, was the wife of John Adams, an Assistant Public Defender who worked in trial counsel's office. Trial counsel had consulted with him on several issues in petitioner's case before learning that his wife might be a potential witness.   Ms. Adams had provided counseling services to the victim some seven – nine years earlier[39] through the DHHR, in conjunction with previous allegations by the victim, then aged nine, of sexual abuse by petitioner.[40] Trial counsel advised the court that he did not learn that Ms. Adams would be a witness until February 19, 2003 and that John Adams would not represent petitioner at trial or be present in the courtroom at all. Ultimately,

---

[36] Dkt.# 34-16 at 6.

[37] Dkt.# 34-16 at 6 – 7.

[38] Dkt.# 34-16 at 8.

[39] Ms. Adams initially counseled the victim beginning in late summer or early fall of 1994, then again in late 1996.  Dkt.# 34-15 at  11 and 15.

[40] Dkt.# 34-15 at 11 – 21.

counsel withdrew his "Adams" motion to withdraw in favor of a motion to strike Ms. Adams on the grounds of relevancy, clearly a strategic decision which is afforded substantial deference under Strickland.

"The Sixth Amendment guarantees an accused the right to effective assistance of counsel, and an essential aspect of this right is a lawyer 'unhindered by conflicts of interest.'" See United States v. Nicholson, 475 F.3d 241, 248 (4th Cir. 2007) (citing Strickland v. Washington, supra and quoting Mickens v. Taylor, 240 F.3d 348, 355 (4th Cir. 2001) (en banc), aff'd, 535 U.S. 162 (2002)). When a petitioner asserts an ineffective assistance of counsel claim based on a conflict of interest, the standard for such a claim is set forth in Cuyler v. Sullivan, 446 U.S. 335 (1980). Nicholson at 249. "To establish a conflict of interest resulted in ineffective assistance, '[m]ore than a mere possibility of conflict must be shown.'" Id. (quoting United States v. Tatum, 943 F.2d 370, 375 (4th Cir. 1991)). Instead, the petitioner must show "(1) that his lawyer was under an actual conflict of interest, and (2) that this conflict adversely affected his lawyer's performance." Id. (citing Cuyler v. Sullivan, 446 U.S. at 348) (internal citations omitted).

To show an actual conflict of interest, the petitioner "must show that [his] interests diverged with respect to a material factual or legal issue or to a course of action." Gilbert v. Moore, 134 F.3d 642, 652 (4th Cir. 1998) (en banc) (internal quotations omitted). Alternately, a conflict of interest exists when counsel is regarded as "account[ing] to two masters" or when he fails to take action on behalf of one client because it would adversely affect another. United States v. Tatum, 943 F.2d at 376.

Here, not only has petitioner failed to show that counsel was under an actual conflict of interest, he cannot show that any alleged conflict adversely affected counsel's performance. He has not even alleged, let alone shown that counsel's interests diverged with respect to his on a material factual or legal issue or on a particular course of action; that he regarded counsel as "accounting to two masters," or that counsel failed to take action on his behalf because it would adversely affect another client. He has not shown that counsel's interests diverged with his with respect to any material, factual, or legal issue, or any realistic course of action. He cites nothing in support of his conflict of interest claim to show that counsel

did not provide effective advocacy and good lawyering on genuinely substantive issues, instead of ineffectiveness or refusal to act in petitioner's best interest. Because he has presented no proof that counsel abandoned his duty of loyalty to him as a client, he has failed to show by a preponderance of the evidence that he is entitled to relief. Accordingly, the undersigned finds, as did the state habeas court, that none of counsel's alleged acts or omissions fell outside the range of professionally competent conduct, and petitioner has failed to establish a reasonable probability that but for counsel's unprofessional errors, the results of the proceedings would have been different.

**1(b), (d), (e) and (f): Trial counsel, provided by the Public Defenders, was hampered by financial constraints, thus he failed to provide petitioner with an adequate defense, including the hiring of experts; obtaining DNA or other medical testing; and moving for an independent psychological exam of the alleged victim; further, because he was ill during the pre-trial period, counsel failed to provide a vigorous defense.**

Petitioner contends that the Public Defenders' financial constraints prevented counsel from obtaining a handwriting expert to refute the validity of the victim's April 25, 2002 letter, and a psychological expert to qualify him for consideration for an alternative sentence of probation. The state habeas court noted that at the omnibus evidentiary hearing, counsel testified that the Public Defenders had no financial constraints sufficient to preclude the hiring of an expert, should one be indicated.[41] Moreover, the undersigned can see no point in obtaining a handwriting expert to disprove the validity of the victim's April 25, 2002 letter, given that the victim herself authenticated it at trial.[42] This claim has no merit and relief should be denied.

As for petitioner's claim that counsel's failure to get an expert's psychological exam on him precluded his receiving probation rather than incarceration, pursuant to W.Va. Code §62-12-2(e), the record clearly shows otherwise. At sentencing, while counsel did advise the court of the not-inconsiderable costs in obtaining such an examination, he indicated the Public Defenders' willingness to obtain one if the court would consider probation; and if so, suggested continuing the hearing to obtain that

---

[41] Dkt.# 34-9 at 15.

[42] Dkt.# 34-12 at 91 – 92.

evaluation.[43]  The State objected, noting that given petitioner's track record on pre-trial bond, he was not a candidate for probation.[44]  The sentencing court agreed, noting that petitioner's flagrant violations of the pretrial bond conditions, by his immediately resuming direct, intimate contact with the child victim, as precluding any opportunity for him to be considered even remotely eligible for probation.[45]  Moreover, at the state habeas omnibus evidentiary hearing, trial counsel testified he believed it would have been futile to obtain a psychological evaluation for purposes of crafting a statutorily-mandated treatment plan[46] for probation under the circumstances, because petitioner steadfastly refused to admit his guilt and no sexual offender treatment is possible if a defendant does not admit guilt and agree to address the issue.  The undersigned agrees, and finds that this claim lacks merit.  Relief should be denied.

Petitioner's next claim is that if only counsel had obtained medical testing or DNA samples to prove that the victim suffered from Hepatitis C,[47] a communicable disease, and similar testing on him, to prove he did *not* have it, it would have exculpated him from having had sexual contact with her.  Ignoring for the moment that both petitioner and the victim had already provided statements admitting to having engaged in sexual activity, the state habeas court found that petitioner offered no evidence to support this unfounded allegation, and trial counsel testified at the omnibus evidentiary hearing that although he had reviewed some medical records, he had no independent recollection of any such disease.  Likewise, the undersigned likewise finds that this claim is insufficiently pled; petitioner has offered nothing to support it.  Nonetheless, such a claim, even if it were true, does not rise to the level of a Sixth Amendment

---

[43] Dkt.# 34-14 at 14 – 15.

[44] Dkt.# 34-14 at 16 - 17.

[45] Dkt.# 34-14 at 19.

[46] W.Va. Code §62-12-2(e) states in pertinent part ". . . such person shall only be eligible for probation after undergoing a physical, mental and psychiatric study and diagnosis which shall include an on-going treatment plan requiring active participation in sexual abuse counseling at a mental health facility or through some other approved program[.]"

[47] At the state omnibus evidentiary hearing, petitioner claimed it was Hepatitis B.  See Dkt.# 34-11 at 29 - 31.

violation.  See <u>Yarborough v. Gentry</u>, 540 U.S. 1, 8 (2003) (the Sixth Amendment guarantees reasonable competence, "not perfect advocacy judged with the benefit of hindsight").

As for petitioner's claim that trial counsel was so medically impaired during the pre-trial period that he was incapable of rendering a vigorous defense, the record does not support it. Even a cursory review of petitioner's underlying criminal docket reveals counsel's careful attention, not only before, but also during and after trial, to timely file motions, request more time when necessary, and vigorously argue on petitioner's behalf. Moreover, the state court found that counsel had unequivocally testified at the omnibus evidentiary hearing that nothing regarding his health interfered with his ability to try the case. The undersigned agrees with the state habeas court that counsel's performance was not deficient, and that other than his own self-serving and conclusory allegations, petitioner has not provided any evidence that counsel's performance fell below an objective standard of reasonableness. Even if he could prove counsel's performance were deficient, petitioner has not shown the results of the proceedings would not have been different.[48] Accordingly, relief should be denied.

**1(c): Trial counsel failed to call any witnesses on petitioner's behalf at trial.**

Petitioner asserts that despite the fact that he gave counsel a list of potential witnesses, counsel failed to investigate, interview and secure their testimony as character witnesses to rebut the litany of W.Va. R. Evid. 404(b) material lodged against him, placing his character at issue.  Further, counsel failed to re-call the child victim about another letter she wrote, recanting the allegations, which would have been "invaluable" for petitioner in his case.

Again, petitioner offers no evidence in support of this claim.  Not only does petitioner offer no evidence to show who his alleged character witnesses would have been and what their testimony would have proved, he cannot show counsel's conduct was deficient or prejudicial.  The trial record reveals that counsel conducted a vigorous cross and redirect exam of each of the State's witnesses, including the child

---

[48] Dkt.# 34-9 at 16.

victim.  At the omnibus evidentiary hearing, petitioner raised this same issue, again, without providing the names of the purported character witnesses or what their testimony would have been.  Counsel testified that he had explored the possibility of character evidence in pre-trial interviews with the victim and her family members, but after hearing what they had to say, chose not to call any of them, because what little testimony they could provide was far outweighed by the potential for prejudice to petitioner's case on cross-exam.  Given the wealth of evidence and testimony at trial, it is understandable why counsel chose not to draw further attention to petitioner's character.  As such, forgoing the extra step of obtaining calling witnesses who could not help petitioner's case, and who might actually produce more evidence further discrediting him in the jury's eyes, was likely a strategic decision which was not unreasonable under the circumstances. A strategic decision generally will not be second-guessed.  Wiggins v. Corcoran, 288 F.2d 629, 640 (4th Circ. 2002).  Likewise, the state habeas court concluded that after interviewing the potential witnesses, based on the victim's recantations and petitioner's continued denial of guilt, counsel did not believe the witnesses would be helpful or necessary to the defense and that the claim should fail.  Similarly, the WVSCA found no grounds for relief.  The undersigned agrees. It is well settled that courts should not hastily second guess tactical decisions made by counsel during the pendency of a trial, because the lawyers have first-hand knowledge of the facts, the witnesses, and information outside the record on review. See e.g. Strickland, 466 U.S. at 691; Bobby v. Van Hook, 558 U.S. 4 (2009). Even if petitioner showed that some testimony "could support [his] defense, it would be reasonable to conclude that a competent attorney might elect not to use it. Harrington, 131 S. Ct. at 789. Relief should be denied.

**1(e): Trial counsel failed to move for independent psychological evaluation of the alleged victim.**

Petitioner claims counsel should have moved for an independent psychological evaluation of the child victim, because she had cut or burned the initials "B.K." into her side, evidence of alleged mental instability.  The state habeas court noted that counsel's testimony at the omnibus evidentiary hearing on this issue was that he saw no need to request psychological testing on the victim because she had spoken to him on at least six occasions and was denying she ever had sex with petitioner.  This is not an

unreasonable application of <u>Strickland</u>. The undersigned agrees, and fails to see how proving the victim mentally incompetent would help petitioner's case, given that she was the star witness he was hanging his hat on, having already recanted all the allegations against him. Moreover, habeas petitioners "must come forward with some evidence that the claim might have merit. Unsupported conclusory allegations do not entitle a habeas petitioner to an evidentiary hearing." <u>Nickerson v. Lee,</u> 971 F.2d 1125, 1136 (4th Cir. 1992). This claim is unsupported and relief should be denied.

**1(g): Trial counsel failed to file a W.Va. R. Crim. Pro. 35(b) motion for reconsideration of petitioner's sentencing as requested, and was dilatory in filing a notice of appeal; further, counsel filed the notice of appeal in the wrong county.**

The state court found that because petitioner had already received a sentence at the lowest end of the guideline, it would have been futile for counsel to file a W.Va. R. Crim. Pro. 35(b) motion for reconsideration of petitioner's sentencing. Counsel is not required to file useless motions. Further, petitioner was not prejudiced by any late filing of the appeal, because counsel and the prosecutor entered an agreed order to extend the deadline for its filing. Likewise, petitioner can prove no prejudice from counsel's alleged error in filing the notice of appeal in the wrong county; because the WVSCA refused his petition for appeal anyway. Petitioner cannot show that the outcome would have been any different had the error in filing not occurred. Moreover, at the state habeas omnibus evidentiary hearing, when pressed, petitioner reluctantly admitted that the WVSCA's May 6, 2004 Order refusing the petition, although it did contain a typographical error indicating the appeal was taken from Berkeley,[49] rather than Morgan County, clearly stated that the petition for the appeal was presented with the record from below accompanying it, meaning that the complete record from *Morgan* County was provided.[50] Clearly, petitioner can prove no prejudice from this error. Further, it is also clear that petitioner was well aware that this claim lacked any shred of merit when he filed the instant petition. Relief should be denied.

**1(h): Trial counsel conducted improper *voir dire.***

---

[49] Dkt.# 34-4 at 2.

[50] Dkt.# 34-10 at 79.

Petitioner contends that during *voire dire,* counsel realized that three jurors in the petit jury panel were known to him, because they had been jurors in one of his trials the previous week; despite that, counsel failed to do any additional *voir dire* on them or use peremptory strikes to strike them.

The state habeas court found nothing improper about the *voire dire* questions asked; the WVSCA affirmed.  A review of the trial transcript reveals that the discovery of the familiar appearance in the three witnesses took place toward the end of *voire dire.*[51]  As such, the three potential jurors had already been questioned as to whether they had any bias against petitioner; whether the facts of the case were such that they would prejudge petitioner; or whether were familiar with defense counsel or any other member of the Morgan County Public Defenders' Office; none of them responded.[52]  Merely because they sat on a case previously litigated by trial counsel does not prove counsel was ineffective.  Petitioner has again failed to allege sufficient facts to demonstrate how he was harmed by counsel's alleged failure. Even assuming that defense counsel should have requested to strike the three, petitioner has not shown that such motion would have been granted, nor that any prejudice occurred as a result.[53]

Upon an independent review of the record, and in light of the evidence presented in the state court proceedings, the undersigned finds that the state court's adjudication of all of the petitioner's claims of ineffective assistance of trial counsel were not contrary to clearly established federal law, and did not result in a decision that was based upon an unreasonable determination of the facts.  The state habeas court properly cited and utilized the test set forth in Strickland to evaluate the petitioner's claims of ineffectiveness.[54]  As such, the undersigned recommends that the court dismiss these claims for lacking merit.

---

[51] Dkt.# 34-12 at 48.

[52] Dkt.# 34-12 at 8 - 48.

[53] It is unknown whether the three actually were chosen as jurors because the trial transcript does not identify them by name.

[54] See Dkt.# 34-9 at 14 – 15.

**1(i), 12, 14, 15 (a), 15(c), 15(d), 15(f), 15(k): The indictment was defective because it did not adequately differentiate the charges, but merely recited duplicative boilerplate language, preventing petitioner from properly asserting a defense. Venue, a necessary element of the crimes charged, was not proven by the State of West Virginia, and thus, the trial court lacked jurisdiction. The indictment's lack of specificity as to the charges caused double jeopardy and impaired petitioner's ability to put on a defense. Trial counsel failed to object to the defective indictment, and failed to request a bill of particulars to clarify the indictment, leaving petitioner to speculate and guess as to what conduct he had purportedly committed.**

Here, in effect, petitioner complains that the trial court erred by not dismissing the "defective" indictment because it did not fully inform him of the conduct for which he was charged, and that trial counsel was ineffective for not challenging the defective indictment by moving for a bill of particulars. Specifically, petitioner argues that indictment was flawed because each count alleged a single sexual act without differentiating which act was being charged, because no specific dates or locations were alleged in the counts, only an allegation that each count occurred in March and/or April, 2002 in Morgan County. Further, petitioner claims that the trial court lacked jurisdiction because nowhere at trial was there any evidence to show any of the alleged acts took place in Morgan County.

In addressing petitioner's various arguments, the Court first addresses petitioner's contention that the indictment was fatally flawed because it did not state with particularity which act was being charged. This argument does not rise to a constitutional question cognizable in habeas review. It has long been held that "the sufficiency of an indictment cannot be reviewed in habeas corpus proceedings." Knewel v. Egan, 268 U.S. 442, 446 (1925). In fact, the Fifth Amendment requirement of an indictment by a grand jury has never been extended to the states. See Alexander v. Louisiana, 405 U.S. 625, 633 (1973) ("Although the Due Process Clause guarantees petitioner a fair trial, it does not require the States to observe the Fifth Amendment's provision for presentment or indictment by a grand jury.").  It then follows that because there is no federal constitutional requirement that a state proceed on criminal charges by way of indictment, then there can be no federal constitutional challenge to the sufficiency of the state indictment itself. What is required of a state indictment turns purely on an interpretation of state law.

However, it is also clearly established federal law that "[n]o principle of procedural due process is more clearly established than that notice of the specific charge, and a chance to be heard in a trial of the

issues raised by the charged . . . are among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal." *Cole*, 333 U.S. at 201. Adequate notice is that which allows a defendant "to identify the issues on which a decision may turn." Lankford v. Idaho, 500 U.S. 110, 126 n. 22 (1991); see also In re Oliver, 333 U.S. 257, 273 (1948) (holding that due process requires that a person be given "reasonable notice of a charge against him, and an opportunity to be heard in his defense . . . to examine the witnesses against him, to offer testimony, and to be represented by counsel").

In its simplest form, the indictment told petitioner that he was being charged with having sexual contact and sexual intercourse with his stepdaughter on three occasions in March and/or April of 2002. This was sufficient; when time is *not* of the essence regarding a crime charged, the absence of specific dates in the indictment does not invalidate the charging document.[55] The state habeas court found that because petitioner's wife testified that the sexual intercourse between petitioner and her daughter occurred in their home, and the victim's letter to petitioner, along with statements from the victim, her mother, grandmother, aunt, and petitioner all provided similar information as to location of the crimes, venue was clearly proved by the minimum preponderance of evidence standard.[56] The undersigned would further note that at trial, the victim testified that she had told the investigating police officer that the sex acts occurred in her home, which was in Paw Paw, in Morgan County, West Virginia;[57] and WVSP Trooper Charles Platt also testified that petitioner told him that he'd awakened, alone in the victim's bed after a night of heaving drinking in March, 2002, feeling like "something" sexual had happened that

---

[55] See State v. David D.W., 588 S.E.2d 156, 163 (W. Va. 2003) (*per curiam*) *overruled on other grounds*, State v. Slater, 665 S.E.2d 674, 683 fn. 9 (W. Va. 2008). See also W. Va. Code § 62-2-10 ("No indictment or other accusation shall be quashed or deemed invalid . . . for omitting to state, or stating imperfectly, the time at which the offense was committed, when time is not of the essence of the offense[.]")

[56] Dkt.# 34-9 at 19.

[57] Dkt.# 34-12 at 116.

"should not have;" being that the family home was in Morgan County, West Virginia,[58] venue was again clearly proved, and therefore, jurisdiction established.

It is further clear that petitioner was well aware of the nature of the charges against him in time to prepare a defense, because he received the victim's April 23, 2002 sexually explicit letter,[59] the most damaging piece of evidence against him, before the State did -- its discovery in his pants pocket several days later by his wife[60] triggered his first interview with the police on April 27, 2002;[61] he was arraigned on September 26, 2002;[62] he learned the victim first recanted the charges in mid-January, 2003[63] (as a result of his own coaching);[64] she repeatedly recanted in 4-6 later meetings with trial counsel before trial;[65] and the issues and evidence were discussed in open court at no less than three pre-trial hearings.[66]

It is clearly established federal law that an indictment is sufficient under the United States Constitution if it "first, contains the elements of the offense charged and fairly informs the defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." Hamling v. United States, 418 U.S. 87, 117 (1974). Furthermore, the sufficiency of a state charging instrument "is not a matter for federal habeas corpus relief unless the indictment is so defective that the convicting court had no jurisdiction." See e.g. Williams v. Collins, 16 F.3d 626, 637 (5th Cir. 1994), *cert. denied*, 512 U.S. 1289 (1994); DeBenedictis v.

---

[58] Dkt.# 59-1 at 56-57.

[59] Dkt.# 34-12 at 92.

[60] Dkt.# 59-1 at 11.

[61] Dkt.# 34-17 at 21.

[62] Dkt.# 1-1 at

[63] Dkt.# 34-17 at 12.

[64] Dkt.# 34-12 at $106-108$ and $114-115$.

[65] Dkt.# 34-11 at 38.

[66] The three pre-trial hearings were January 17, 2003; March 7, 2003; and April 7, 2003.

Wainwright, 674 F.2d 841, 842 (11th Cir. 1982). To show this, the indictment must be "so fatally defective that under no circumstances could a valid conviction result from facts provable under the indictment." Johnson v. Estelle, 704 F.2d 232, 236 (5th Cir. 1983).

The state habeas court, citing the West Virginia Constitution and rules of criminal procedure, found that the indictment sufficiently stated the charges against him, and that it met both state and federal constitutional requirements related to providing notice to the accused of the charges against him, sufficient to provide him ample opportunity to understand those charges and develop a defense. Specifically, it found that the incidents in question were sufficiently laid out so that there was no confusion as to what crimes were being charged. After reviewing the indictment, the undersigned agrees. Petitioner cannot show that the WVSCA's ruling affirming the denial of his state habeas petition was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement." Harrington, 131 S. Ct. at 787. Here, it is clear that petitioner was apprised of the "issues on which a decision may turn." Cole, 333 U.S. at 201. The undersigned finds that this is not contrary to, or an unreasonable application of any clearly established federal law. Accordingly, no relief can be granted on this ground.

Because the indictment was not defective, counsel cannot be ineffective for not challenging it. Nonetheless, a review of the record reveals that at the state habeas omnibus evidentiary hearing, when asked whether he and counsel had an opportunity to consider his complaint about the alleged "multiplicity and duplicity" of the indictment's charges, petitioner admitted that counsel had "made a motion or something, objection or something to that nature, but it was just cut off as soon, I mean, before, you know, ended right there. Boom, the judge ended it."[67] Clearly, petitioner is well aware that counsel *did* challenge the indictment: counsel's motion to dismiss the indictment was filed the day before the March

---

[67] Dkt.# 34-10 at 46 - 47.

7, 2003 pre-trial hearing. In open court the next day, counsel stated he was withdrawing the motion after consulting with his client. Petitioner did not object.[68]

Petitioner's next claim is that counsel failed to request a bill of particulars to clarify the indictment, leaving him to speculate as to what conduct he had purportedly committed, thus hampering his defense. While the habeas court did not specifically address this particularly ridiculous claim of ineffective assistance, as noted *supra,* it found that the indictment was sufficient. The WVSCA similarly found that the habeas court did not abuse its discretion in refusing to grant relief. The undersigned agrees. Because the charges in the indictment were already clear, there was no need for a bill of particulars, especially given that the victim denied any crime had occurred at all. Counsel cannot be deemed constitutionally ineffective for failing to file a frivolous motion.[69] Further, a defendant has no constitutional right to a bill of particulars. See Powell v. Kelly, 562 F.3d 656 (4th Cir. 2009), *cert. denied*, 130 S. Ct. 1281 (2010).

Petitioner's final contention is that there was such multiplicity and duplicativeness in the charges in the indictment, that they were indistinguishable from one another, such that he might have been convicted twice for the same crime.

Inherent in this Fifth Amendment protection is the assurance "that the [sentencing] court does not exceed its legislative authorization by imposing multiple punishments for the same offense." Brown v. Ohio, 432 U.S. 161, 165 (1977). The seminal case in Supreme Court jurisprudence to introduce a test used to determine whether a sentencing court has run afoul of this right is Blockburger v. United States, 284 U.S. 299 (1932). The Blockburger test, simply stated is "whether each of the two offenses requires proof of a different element. If each requires proof of a different element, then an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other." Manokey v. Waters, 390 F.3d 767, 772 (4th Cir. 2004).

---

[68] Dkt.# 34-16 at 8.

[69] Strickland, *supra* at 690.

Petitioner claims he could be exposed to double jeopardy, because each charge did not specifically identify on what date the crime occurred, thus he might have been convicted twice of the same crime. West Virginia Code §61-8D-5, the sexual abuse by a custodian statute, provides that

> any parent, guardian or custodian of or other person in a position of trust in relation to a child under his or her care, custody or control, shall engage in or attempt to engage in sexual exploitation of, or in sexual intercourse, sexual intrusion or sexual contact with, a child under his or her care, custody or control, notwithstanding the fact that the child may have willingly participated in such conduct, or the fact that the child may have consented . . . or the fact that the child may have suffered no apparent . . . injury as a result of such conduct, then such parent, guardian, custodian or person in a position of trust shall be guilty of a felony[.]

The incest statute, W.Va. Code §61-8-12(b) provides that:

> [f]or the purposes of this section: "Father" means a person's natural father, adoptive father or the husband of a person's mother; . . . [a] person is guilty of incest when such person engages in sexual intercourse or sexual intrusion with his . . . daughter . . ."

Finally, W.Va. Code §61-8B-5(a)(2), the third degree sexual assault statute, provides: (a) A person is guilty of sexual assault in the third degree when:

> (2) The person, being sixteen years old or more, engages in sexual intercourse or sexual intrusion with another person who is less than sixteen years old and who is at least four years younger than the defendant and is not married to the defendant.

It is clear on the face of the statutes that each of the three instances of sexual contact with his stepdaughter resulted in the commission of three separate crimes, each requiring proof of different elements. Sexual abuse by a parent, guardian, custodian requires proof that a person who is either a parent, guardian, custodian, or another person in a position of trust in relation to a child under his or her care, custody or control, engages in or attempts to engage in sexual exploitation of, or in sexual intercourse, sexual intrusion or sexual contact with, a child under his or her care, custody or control. The crime of incest required proof that the victim was petitioner's daughter, and that petitioner engaged in sexual intercourse or intrusion with her. And the crime of third degree sexual assault required proof that petitioner, was sixteen years old or older than his victim, engaged in sexual intercourse or sexual intrusion with her, and that she was less than sixteen and at least four years younger than he and not married to him. Thus, each of the three crimes charged required proof of different elements, not required by the

others, all of which were charged in the indictment. Moreover, the victim initially admitted to the investigating offer that she had had sex at least three times with her father. Because each of the three separate acts of unlawful sexual relations with his daughter violated three separate state statutes, the multiplicity that petitioner complains of in the indictment was warranted. Accordingly, the undersigned finds, as did the state habeas court, that petitioner has provided no evidence to support his claim that his convictions under the three statutes violated double jeopardy, further, there is nothing in the record to indicate it. Accordingly, no relief can be granted.

**2: Petitioner was denied the right to a speedy trial.**

Petitioner contends that at his arraignment on September 26, 2002, a jury trial was originally scheduled for January 22, 2003, but because of "numerous pre-trial hearings and several continuances," it was not actually held until April 8, 2003. He claims that "despite his waiver of a speedy trial at Arraignment [sic], he was not fully informed as to the ramifications of that decision if he was to no longer be at his liberty." Further, he argues that the multiple pre-trial hearings afforded the State the ability to "muster their resources" far more efficiently than if trial had been held in January, 2003 as originally scheduled.

A review of the record reveals that petitioner was indicted on September 3, 2002. After his September 26, 2002 arraignment, during which he was represented by counsel and waived his right to a speedy trial, he was released on a $5,000.00 cash bond, with instructions to have no direct or indirect contact with the victim. He remained free on bond until he violated its conditions by having direct contact with the victim, and was then arrested on January 11, 2003. At that point, petitioner, through counsel, filed not one, but two motions to continue the trial, first on January 17, 2003 and again on March 6, 2003. On April 1, 2003, trial, which had been scheduled for April 24, 2003, was rescheduled to April 8, 2003.[70] Pursuant to certain enumerated exceptions in W.Va. Code §62-3-21, one of which is

---

[70] Dkt.# 1-1 at 4 – 6.

continuances granted at the defendant's own request, the undersigned finds, along with the state habeas court and the WVSCA, that petitioner is not entitled to relief on this ground. Moreover, also pursuant to W.Va. Code §62-3-21, because he was brought to trial within three terms of court, his speedy trial right under the Sixth Amendment was not implicated. The undersigned finds that this is not contrary to, or an unreasonable application of any clearly established federal law. Thus, no relief can be granted.

**3: Because of his severe substance abuse, petitioner's mental competency was compromised, which affected his criminal responsibility or lack thereof, and his ability to assist counsel in the preparation of his defense.**

Petitioner contends that because of his "history of rampant alcohol and marijuana use," he should have had a psychological evaluation to determine his competence assist in his own defense, stand trial, or to assert a diminished capacity defense. He avers that with the aid of such an evaluation, "it is possible that several ailments listed in this habeas memorandum could have been cured including the sudden availability of powerful defense witnesses and future use at sentencing for the potential outcome of probation."[71]

After petitioner's pre-trial bond was revoked in early January, 2003, he was incarcerated and remained so through trial. At the January 13, 2011 state habeas omnibus evidentiary hearing, petitioner appeared in person with habeas counsel. Trial counsel testified regarding his frequent contacts with petitioner, in person, at the jail or elsewhere, or by letter or phone,[72] advising that he was aware of petitioner's substance abuse but never saw any evidence of incompetency[73] and did not obtain a psychological exam because he did not think one was indicated. Petitioner testified that he was employed as a contractor and was doing that work when indicted, indicating that even when actively abusing substances, he was still mentally competent. Further, he admitted he was prevented from drinking or

---

[71] Dkt.# 1 at 28.

[72] Dkt.# 34-11 at 35, 38, 43 – 44.

[73] Dkt.# 34-11 at 37.

smoking marijuana for more than three months preceding the trial because he was in jail.[74]  The state habeas court noted that at his January 17, 2003 pretrial hearing, less than a week after his bond was revoked, petitioner testified appropriately, with good recall for dates and details. Accordingly, it found that petitioner had produced no evidence to show he was incompetent and thus failed to establish a right to relief on this claim.  The undersigned agrees.  The undersigned finds that this is not contrary to, or an unreasonable application of any clearly established federal law. Thus, no relief can be granted.

As for the need to obtain such an exam in order to assert a diminished capacity defense, the undersigned finds that such a defense was unnecessary, because it was completely inconsistent with petitioner's stance at trial, that he had never committed any crime.  This claim has no merit; relief should be denied.

**4: The exculpatory evidence of the alleged victim's recanting to the State her story of abuse, was impermissibly withheld from petitioner.**

Petitioner contends that the State never shared the "exact details" of the victim's recantation of the charges with him, and a phone conversation, taped at the jail between the victim and petitioner after his bond was revoked was of such poor quality, "it could not be intelligently disclosed."

First, there is no constitutional right to discovery.  See Weatherford v. Bursey, 429 U.S. 545, 559 (1977).  The prosecution is only required to turn over exculpatory evidence or evidence which could be used for impeachment purposes.  See Brady v. Maryland, 373 U.S. at 87.  Therefore, matters of discovery are generally left to the state courts.

Here, there is no support in the record for petitioner's claim. Although petitioner testified at the January 13, 2011, state habeas omnibus evidentiary hearing that he was certain the victim recanted prior to the September 3, 2002 indictment, a careful review of the considerable record does not support this. However, it is apparent that petitioner and defense counsel were well aware of the victim's recantation as early as nearly three months before trial, because they were verbally informed by the prosecutor at the

---

[74] Dkt.# 34-11 at 6 – 7.

January 17, 2003 pretrial hearing, that on January 15, 2003, the victim recanted to the prosecutor.[75] Counsel testified at the omnibus hearing he met with the victim 4-6 times before trial, after the initial recantation.[76] A tape recording of a phone conversation[77] petitioner had with the victim while in jail revealed that petitioner was coaching her to keep lying to her guardian *ad litem* about the charges.[78] The victim testified repeatedly at trial that during that call, petitioner had told her to "tell the truth," that "nothing" had happened between the two of them.[79] Moreover, also during the omnibus evidentiary hearing, petitioner admitted he was aware the victim had recanted well before trial.[80] He further testified that he received a second letter from the victim, in "January of 2002 [sic]," two weeks after his bond was revoked,[81] which was almost three months before trial. In the letter, the victim purportedly implied she had only made the charges against him to get him to quit drinking.[82]

The record clearly indicates that contrary to petitioner's present claim, he was well aware of the recantation almost as soon as it occurred. Because petitioner has failed to demonstrate that exculpatory evidence in the form of the victim's recanting the charges was ever withheld by the prosecution, he cannot prove a constitutional violation.

**5 and 7: The State's impeachment techniques used on its own witness/alleged victim were impermissible under W. Va. R. Evid. 607; the letter purportedly drafted by the alleged victim was admitted in error; and the trial court committed reversible error by permitting the State to present evidence via W. Va. R. Evid. 404(b).**

---

[75] Dkt.# 34-17 at 12.

[76] Dkt.# 34-11 at 38.

[77] Although the date of the phone call is nowhere referenced in the trial record, it is apparent that this call was made some time after January 17, 2003 but before March 21, 2003. The trial record reveals that the victim's guardian *ad litem* was not appointed until after the January 17, 2003 pretrial hearing. Dkt.# 34-17 at 7 and 17. The state habeas court's opinion noted that the State provided the defendant with notice of the recording on or about March 21, 2003. Dkt.# 34-9 at 12.

[78] Dkt.#34-12 at 106 – 110, 112 – 115.

[79] Dkt.# 34-12 at 106 – 115.

[80] Dkt.# 34-10 at 47.

[81] Petitioner misspoke; two weeks after bond was revoked was January, 2003.

[82] Dkt.# 34-10 at 51 – 54. Trial counsel's testimony gave a much different description of the contents of that letter. See Claim 15(h), *infra* at page 39, for counsel's description of the letter.

Petitioner claims that the State, by calling the victim as their witness, knowing she had already recanted and would maintain that posture at trial, only did so in order to introduce into evidence the April 23, 2002 sexually explicit letter she had written to him as impeachment evidence. Further, petitioner claims that the trial court committed reversible error by allowing evidence of petitioner's prior bad acts under W.Va. R. Evid. 404(b).

These contentions are based either upon the West Virginia Rules of Evidence, or on interpretations of West Virginia law. Because there is no federal constitutional question raised, these questions are beyond the scope of review under §2254.

**6: Petitioner's right to bail was revoked without sufficient cause.**

Petitioner contends that the terms of the bond, forbidding him to have any contact with the victim, were not "clearly elucidated to him" and thus his violation of the same was inadvertent. He claims the court abused its discretion by incarcerating him for "innocent and harmless indiscretions."[83]

A review of the record reveals that petitioner was granted bond on September 26, 2002; he signed it, agreeing to its two conditions: that he not violate any state or federal law and have "no contact direct or indirectly with the alleged victim or his or her family.[84] At a January 17, 2003 pretrial hearing, Paw Paw, W.Va. Police Chief Wade J. Shambaugh testified that on Thursday, January 9, 2003, the prosecutor called him, advising she had received a report that petitioner was back at the residence with the victim. The next day Shambaugh went to the house, and from a short distance, observed petitioner at the home. When petitioner left the residence, Shambaugh went to the door and found the victim and her mother there.[85] Bond was revoked the next day, and Shambaugh and WVSP Senior Trooper Platt went to the home at around 10:30 p.m. to arrest petitioner; they found him semi-reclined on the couch, watching TV in the

---

[83] Dkt.# 1 at 37.

[84] Dkt.# 34-17 at 82.

[85] Dkt.# 34-17 at 73-74

dark, cuddled up, with his arm around the victim, wearing nothing but shorts with no underwear underneath.[86]   Moreover, *en route* to the police station after being arrested, petitioner grumbled to Shambaugh "I knew this would happen,"[87] indicating his awareness of the wrongfulness of his behavior. Further, there was testimony at trial about an incident in late November, 2002, where petitioner and the victim two were observed driving slowly down the road, and the victim, after initially not being visible, suddenly popped up, arising from the middle of the floor of the vehicle, with her head bent over in the general area of petitioner's lap; and petitioner's wife testified that petitioner and the victim slept together on a mattress on the floor of the living room for three nights in a row in late December, 2002, with petitioner cuddled up under the covers with the girl, "holding her like a body pillow."[88]  It is apparent that petitioner had been deliberately flouting the terms of his pre-trial bond for some time before he was discovered. At the first pre-trial hearing on January 17, 2003, less than a week after bond was revoked, in denying trial counsel's motion to readmit petitioner to bond, the court noted

> I believe that even a person lacking sophistication who is charged with sexual abuse by a parent or custodian or incest would perhaps sense that returning to a household and being discovered their [sic] apparently cozy and dressed in his underwear with an infant who is alleged to be the victim might be a violation of something. . . It appears that Mr. King's bond was righteously jerked last week when he was discovered in this condition. . . It doesn't appear to this Court that he should be readmitted to bond[.][89]

The state habeas court summarily dismissed this preposterous claim and denied relief, as did the WVSCA.  The undersigned does the same.

**8 and 15(g), 15(i), and 15(l):  Prosecutorial misconduct occurred when the State knowingly used the alleged victim's perjured testimony; falsified documents to "obtain an advantage upon" petitioner; and committed reversible error by misquoting the evidence in the matter *sub judice* to the petit jury in closing argument.**

---

[86] Dkt.# 34-17 at 75-77.

[87] Dkt.# 34-17 at 79.

[88] Dkt.# 59-1 at 15.

[89] Dkt.# 34-17 at 82 – 83.

In order to establish prosecutorial misconduct, the petitioner must show that the prosecutor's conduct was so egregious as to render his trial fundamentally unfair. United States v. Young, 470 U.S. 1, 11-12 (1985). Moreover, in Brady v. Maryland, 373 U.S. 83, 87 (1963), the Supreme Court held that "[t]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985); United States v. Cole, 293 F. 3d 153 (4th Cir.), cert. denied, 123 S.Ct. 387 (2002). It is clearly established federal law that the relevant inquiry into this claim is "whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986). Further, "it is not enough that the prosecutor's remarks were undesirable or even universally condemned." Id.

Petitioner contends that the prosecutor knowingly used perjured testimony because the State knew that the victim recanted her allegations before he was indicted. Further, he contends that the victim's initial statement to the police was taken without a parent or guardian present, thus it was "less than forthright and spontaneous." He contends that because victim's guardian *ad litem* was not appointed until later, any of her statements made prior to that point should have been suppressed.

At trial, the prosecution presented the victim's April, 23, 2002 letter to petitioner alluding to their sexual relationship; her initial statements admitting to the sex acts to Trooper Platt; her later recantations; and the victim testified and was cross examined as to each. The state habeas court found that it was the jury's job to assess credibility and to give weight to each of the statements. Although there certainly was some inconsistency in the testimony presented, a constitutional question is only raised when the "prosecution knew, or should have known," of any false testimony. United States v. Agurs, 427 U.S. 97, 103 (1976). There is no evidence that the state knowingly introduced perjured testimony. Moreover, a thorough review of the record reveals that the first report by either party of the victim recanting was on

January 15, 2003,[90] during a meeting with the prosecutor, four days after petitioner's bond was revoked, and nearly four and a half months after he was indicted. As far as the victim's recantation of the charges, and the inconsistencies in what she wrote versus what she later disavowed verbally at trial, trial counsel vigorously cross-examined her to elicit testimony favorable to petitioner. The state habeas court found that there was sufficient corroborating evidence to support the victim's original allegations and that the trial court correctly ruled that her credibility was a matter for the jury. The undersigned agrees that it was then the jury's job to believe or disbelieve the testimony, and the state court's determination was not contrary to, or an unreasonable application of, any clearly established federal law.

As for petitioner's contention that the victim's initial statements to the police should be suppressed because they were not given in the presence of a parent or guardian, petitioner cited no law in support, understandably, because this is not the law. The undersigned finds, as did the state habeas court, that because the victim was not a suspect, but rather, a victim of a crime, she was fully capable of giving a statement without counsel or a parent present. Moreover, the record reflects that her very first written statement was given in the presence of her mother.[91] This claim lacks merit and relief should be denied.

Petitioner's next claim, that the prosecutor committed prosecutorial misconduct "before during and after his trial commenced," by denying the grand jury access exculpatory material, specifically, the victim's recantation of her claims, has already been addressed *supra* and found to be completely without merit.

Next, petitioner alleges that in closing argument, the prosecutor implied that on one occasion, petitioner admitted having woken up in the victim's bed with her, as opposed to having woken up in the victim's bed, alone. A review of the record reveals that trial counsel immediately objected to the

---

[90] Dkt.# 34-17 at 12.

[91] Dkt.# 34-12 at 93 – 95.

misstated evidence.  Following the objection, the prosecutor read directly from the statement, eliminating any confusion as to the statement and clarifying the record.[92]

Petitioner also objects to the prosecutor's implication, also in closing argument, that a witness, deer hunting in a tree stand, observed petitioner driving his truck at approximately 10 m.p.h. down Rt. 9, in a 55 m.p.h. zone, with the victim, who, after initially not being visible, appeared to "pop up" from the vicinity of the petitioner's lap.  Petitioner has no grounds to object to this statement, because the prosecutor was merely re-stating the evidence given by the witness.

Finally, petitioner contends the prosecutor improperly "blended together" information about the location of the victim's and petitioner's bedrooms within their residence with an allegation of petitioner's guilt.  The state habeas court found that this comment was not improper, because the prosecutor was merely explaining how the petitioner's residence was connected to the element of venue that the State was required to prove.

The undersigned has reviewed each incident cited by the petitioner and fails to see how any of the remarks were improper.  It is a fundamental principal of law that opening and closing statements are not testimony and the jury should not regard them as such.  The jury in this case was so instructed numerous times.  See United States v. Coleman, 7 F.3d 1500, 1506 (10th Cir. 1993) ("[a] principal tenet of jurisprudence is that jurors are presumed to follow the law").  What the petitioner really asserts is that the prosecution should not have tried to convince the jury that its evidence showed that he was guilty of the crimes for which he was charged.  That, however, is the very purpose of opening and closing arguments.  During closing arguments, the prosecutor told the jury what she thought the evidence proved.  Having carefully reviewed the entire transcripts of the trial, and specifically, the prosecutor's closing remarks, the Court can find no statements or actions on the part of the prosecution that were so improper that this court would not have confidence in the outcome of the proceedings.  Any improper remarks were inconsequential and did not render the petitioner's trial fundamentally unfair.

---

[92] Dkt.# 34-13 at 47 – 48.

Petitioner's claims that the prosecutor "unjustly altered documents to obtain an advantage upon him" and "played a direct role in the appointment of his habeas counsel," are merely bare-boned conclusory allegations that do not meet the heightened pleading requirements for habeas petitions.[93] Nowhere does petitioner identify what documents were altered, how they were altered, or how he was harmed thereby. Likewise, he offers no evidence to support his claim that the prosecutor was improperly involved in the appointment of his habeas counsel. Even if true, he does not explain how he was harmed. A careful review of the record does not support such a claim. Accordingly, relief should be denied.

**15(h): Helpful exculpatory evidence, in the form of a written statement from the victim, was suppressed.**

Petitioner avers that he was denied a fair trial because a written statement of the victim, in the form of a another letter written to him in jail, two weeks after his bond was revoked, was exculpatory evidence that was suppressed, in violation of W.Va. R. Crim. Pro. 26.2. Further, he contends counsel was ineffective for failing to request the same "in an appropriate and timely fashion."

W.Va. R. Crim. Pro. 26.2, Production of Statements of Witnesses, states in pertinent part:

(a) Motion for production. - After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, shall order the attorney for the state or the defendant and the defendant's attorney, as the case may be, to produce for the examination and use of the moving party any statement of the witness that is in their possession and that relates to the subject matter concerning which the witness has testified . . .

(e) Sanction for failure to produce statement. - If the other party elects not to comply with an order to deliver a statement to the moving party, the court shall order that the testimony of the witness be stricken from the record and that the trial proceed, or, if it is the attorney for the state who elects not to comply, shall declare a mistrial if required by the interest of justice.

Here, it is apparent that petitioner has greatly confused the facts, as well as the intent and purpose of W.Va. R. Crim. Pro. 26.2 in providing accurate information regarding a witness' credibility. Petitioner's only hope for exoneration at trial was for the jury to find the victim's testimony recanting the charges credible. Moreover, the victim was the State's (albeit hostile) witness; the January, 2003 letter

---

[93] McFarland v. Scott, *supra* at 856.

from her to him in jail was *never* in the State's possession, only in petitioner's, then trial counsel's, and then petitioner's once again. Because the State was unaware of the letter's existence, it could hardly be compelled to produce it.  Counsel testified at the state habeas omnibus evidentiary hearing that he let his investigator and five attorneys at the Public Defenders read the letter, to see if they would use it at trial if they were defending the case, and ". . .the uniform answer was, "are you *nuts?*""[94]  Although the exact text of the letter is nowhere in the record, counsel testified that the letter lent further credence to the State's theory that petitioner was influencing the victim's recantation testimony through phone calls while incarcerated,[95] and that it was ". . . not the kind of letter you want the jury to read when your client's accused of having sex with his stepdaughter."[96]  Counsel testified that his office returned the letter to petitioner, with a cover letter advising him "[y]ou're nuts if you want to show this to anybody."[97] Despite petitioner's contention otherwise, this letter was obviously not exculpatory; would have seriously undermined the victim's already-dubious credibility, and was so potentially damaging to petitioner's entire defense that the Public Defenders all recommended that he not show it to anyone, a strategic decision that will not be questioned here.  The undersigned, like the state habeas court and the WVSCA, finds that relief is unwarranted.

**9: The evidence was insufficient to warrant a conviction and a judgment of acquittal should have been ordered.**

Petitioner claims that overall, there was insufficient evidence to convict him of the charges, because no one ever saw him engage in sexual intercourse with his stepdaughter; she recanted the allegations; and there was no DNA evidence implicating him.

---

[94] Dkt.# 34-11 at 67 – 68.

[95] The State produced a tape recording of one of these calls at trial, where petitioner was heard telling the victim to say the charges were all a lie and that nothing sexual happened between them.

[96] Dkt.# 34-11 at 68.

[97] Dkt.# 34-11 at 68.

While the state habeas court found that there was sufficient evidence to support a conviction beyond a reasonable doubt, and the WVSCA affirmed its decision, it is clearly established law that a federal habeas court sitting in review of a state court conviction may entertain a sufficiency of the evidence claim. See Jackson v. Virginia, 443 U.S. 307 (1979). To be successful in this claim, petitioner would have to show that upon the record evidence adduced at the trial, viewed in the light most favorable to the prosecution, no rational trier of fact could have found proof of guilt beyond a reasonable doubt. Id. at 319.

The state of West Virginia presented a great deal of evidence to the jury through nine witnesses over the two-day trial. That evidence included: testimony from the victim, a hostile witness, admitting to writing the April 25, 2002 sexually explicit letter to petitioner about their relationship, asking him for sex;[98] admitting telling the investigating officer that petitioner told her that she was going to get him in trouble for having sex with him;[99] testimony from the investigating officer as to the victim's initial admissions and statements;[100] her later recantations;[101] her admissions to having told a DHHR worker about engaging in sex with her stepfather;[102] her own description of the sex acts to the investigating officer;[103] her admission to a social worker that she loved petitioner "like a boyfriend," not "like a dad;"[104] her tape-recorded phone call with petitioner at the jail, in which he coached her to tell her guardian *ad litem* that the charges were "all a lie;"[105] her admission to having alleged, at "around nine or ten" years of

---

[98] Dkt.# 34-12 at 91 – 94, 98.

[99] Dkt.# 34-12 at 98 – 99.

[100] Dkt.# 59-1 at 49, 61 – 62.

[101] Dkt.# 34-12 at 99 – 99, 118 – 121, 125 – 126, 130, and 134.

[102] Dkt.# 34-12 at 105 – 106.

[103] Dkt.# 34-12 at 115 – 116.

[104] Dkt.# 34-12 at 133 – 134.

[105] Dkt.# 34-12 at 106 – 107, 113 – 115, 117 -118.

age, that petitioner had touched her sexually, prompting DHHR to remove her from the home and send her to live with her grandmother;[106] and her admission that even after petitioner was forbidden to have contact with her while out on bond, they continued go out together late at night, with her functioning as his "designated driver" because he was too drunk to drive.[107] There was testimony from the victim's aunt about petitioner and the victim cuddling inappropriately under the covers in bed, with petitioner's pants on the floor next to the bed.[108] The victim's grandmother testified as to witnessing multiple incidents where petitioner and the victim locked themselves in his or her bedroom alone together for long periods of time, refusing to open the door.[109] Further, the grandmother testified that she confronted petitioner, advising him that it was unacceptable for him to sleep with the girl in light of the earlier allegations of molestation.[110] There was testimony from the victim's mother about finding the April 23, 2002, sexually explicit letter from her daughter to her husband in his pocket;[111] her daughter's asking her husband if he had found and/or read her letter yet, and her daughter rebuking her when she overheard and inquired about it;[112] her daughter and petitioner's locking themselves in the bedroom alone together;[113] her daughter's going out "to the bars" and staying out till the wee hours of the morning with her husband;"[114] seeing her husband naked at one end of the couch with the victim, fully clothed, asleep at the other end, on one occasion at least a year earlier;[115] seeing petitioner and the victim sleeping on a mattress on the

---

[106] Dkt.# 34-12 at 100 – 103.

[107] Dkt.# 34-12 at 105.

[108] Dkt.# 59-1 at 5 – 7.

[109] Dkt.# 34-12 at 145 -147, Dkt.# 59-1 at 1 – 4.

[110] Dkt.# 34-12 at 147.

[111] Dkt.# 59-1 at 9 – 10.

[112] Dkt.# 59-1 at 11.

[113] Dkt.# 59-1 at 12 – 13 and 32 .

[114] Dkt.# 59-1  at 13.

[115] Dkt.# 59-1 at 13 – 14.

living room floor together, three nights in a row[116] during the last week of December, 2002,[117] with petitioner cuddled around the victim, holding her "like a body pillow;"[118] that petitioner typically never wore underwear;"[119] on one occasion, after petitioner and the victim asked her to go to the store for them, she unwillingly went,[120] only to come home to find the victim's pants and petitioner's T-shirt lying on the bathroom floor where they had not been when she left, with a "circle of wetness" on the front of petitioner's T-shirt that "smelled like sex;"[121] that there were "always rumors going around" in the community about petitioner and her daughter having sex;[122] and that when the police came to arrest petitioner for violating bond, he was lying cuddled up on the couch with the victim, wearing nothing but a pair of shorts with no underwear.[123] She also testified that she was present when the victim gave her initial written statement to the police, admitting having had sex with her father,[124] and that she had previously discussed her concerns about her daughter and husband locking themselves in the bedroom alone together with her own mother, the victim's grandmother.[125] The investigating officer testified that on April 27, 2002, when initially confronted with the April 25, 2002 letter from his stepdaughter, petitioner first claimed to have "no idea" what his stepdaughter was referring to, but then admitted "if what happened is

---

[116] Dkt.# 59-1 at 14 – 15 and 37 – 38.

[117] Petitioner was on pre-trial bond at this time, with the condition that he have no contact with the victim.

[118] Dkt.# 59-1 at 15.

[119] Dkt.# 59-1 at 18.

[120] Dkt.# 59-1 at 39.

[121] Dkt.# 59-1 at 16 – 17, 33 – 34, and 36.

[122] Dkt.# 59-1 at 17 and 33.

[123] Dkt.# 59-1 at 17 – 18.

[124] Dkt.# 59-1 at 30.

[125] Dkt.# 59-1 at 31 .

what she claims to have happened then I must have been drunk;"[126] petitioner admitted that there was a "good possibility" that he had sex with the victim while he was drunk;[127] and on May 14, 2002, petitioner gave another statement, admitting having awakened alone in the victim's bed after drinking heavily one night in early or mid-March, 2002, not remembering what happened but feeling like "something happened that shouldn't have," and that afterwards, the victim began being unusually and overly affectionate, trying to kiss him on the lips instead of on the cheek, like she had formerly done."[128] The officer further testified that when he initially interviewed the victim, she first denied having sex with her stepfather but once confronted with the April 25, 2002 letter, she admitted it.[129] There was also testimony at trial that regarding prior allegations of a sexual nature made by the child victim against petitioner in 1996, prompting DHHR intervention and the victim being removed from the home;[130] that petitioner had told the victim back in 1996 not to discuss in counseling what happened at home;[131] the victim avoided talking about sexual issues during counseling over the 1996 molestation episode;[132] the victim recanted the 1996 sexual allegations in order to get to return to her home;[133] the sexual relationship between petitioner and the child victim was known or suspected in the community;[134] petitioner's history of heavy marijuana and alcohol use;[135] and the revocation of bond for having contact with the victim after petitioner was seen in

---

[126] Dkt.# 59-1 at 52-53.

[127] Dkt.# 59-1 at 53.

[128] Dkt.# 59-1 at 44 – 45 and 54 – 57.

[129] Dkt.# 59-1 at 62.

[130] Dkt.# 34-12 at 144, Dkt.# 34-13 at 5 – 11. The victim would have then been approximately nine years old.

[131] Dkt.# 34-13 at 10 – 12.

[132] Dkt.# 34-13 at 10.

[133] Dkt.# 34-12 at 131 – 133.

[134] Dkt.# 34-17 at 20, Dkt.# 59-1 at 17, 33, 47 – 48, and 60 – 62.

[135] Dkt.# 34-12 at 99 – 100, 123 -125, Dkt.# 59-1 at 44, and 53 - 55.

late November, 2002, driving slowly in a rural area in his truck with the victim, who appeared to be getting up from the floor of the vehicle from having been bent over onto him, in the vicinity of his lap.[136]

Thus, the jury certainly had sufficient evidence before it to support its verdict that the charged sexual crimes were committed. Despite the victim's recantations, the jury was free to assess her credibility and that of all the witnesses, and to give such weight to the statements and evidence as it thought was due. It is clear that the jury took this case seriously, deliberating before returning the verdict finding petitioner guilty on all counts. As such, the undersigned cannot say that "no rational trier of fact could have found proof of guilt beyond a reasonable doubt."[137] Accordingly, because the evidence was sufficient to convict, there was no grounds for a judgment of acquittal, and no relief can be granted on this ground.

## 10 and 11: Petitioner Received a Far More Severe Sentence than Expected, and his Sentence was Excessive.

Petitioner contends that his sentence was much more severe than he had been led to believe, and that it was excessive, "given the circumstances and lack of evidence against him." He contends that "if permitted by psychological evaluation, [the court should have] considered a treatment plan and term of probation and/or other alternative sentencing" and notes he should receive a resentencing to a "more appropriate level commensurate with his level of culpability." Further, he avers he was "shocked and dismayed at the lack of preparation and effort in his sentencing presentation," and that the "denial of expert services rendered any argument for probation . . . moot." Finally, he contends that "winnowing down the choices for the Court due to an improper bond revocation hearing, left the Petitioner[.]"[138]

---

[136] Dkt.# 34-15 at 30-36, Dkt.# 34-12 at 136 – 139. At the time, petitioner was on pre-trial bond with the condition that he have no contact with the victim.

[137] Jackson v. Virginia, 443 U.S. 307 (1979).

[138] This sentence appears at the bottom of the page in petitioner's complaint, and does not continue on the subsequent page. (Dkt.# 1 at 52). Petitioner appears to have omitted to include the continuation page out of his memorandum, so the undersigned can only speculate as to what was "left" to petitioner under the circumstances.

The state habeas court found that petitioner already received the minimum sentence, to run concurrently, on all charges, thus he received the lowest possible sentence he could possibly receive under the law. The WVSCA found no error in this regard. The undersigned agrees. Given the contents of the victim's brutally explicit April 23, 2002 letter, petitioner likely was seriously under-charged. Further, given the testimony and evidence, petitioner's continued refusal to accept responsibility, his flagrant disregard for the conditions of pretrial bond, and his stated opinion that those gross violations were merely "innocent and harmless indiscretions," petitioner's sentence was likely lenient in the extreme. Had petitioner actually received a sentence at a "more appropriate level commensurate with his level of culpability," it would have been far more severe.

To the extent that petitioner is contending that counsel was ineffective, for leading him to believe he would receive a lesser sentence, and presumably, his "lack of preparation and effort" at the sentencing hearing, the Fourth Circuit, as well as several other circuits of the United States Court of Appeals, have held that a "miscalculation or erroneous sentence estimation by defense counsel is not a constitutionally deficient performance rising to the level of ineffective assistance of counsel." McLachlan v. United States, 2008 U.S. Dist. Lexis 10611 at 6, quoting Hughes v. United States, 2007 U.S. Dist. Lexis 19416, 2007 WL 841940 at *4 (W.D.N.C. 2007), citing United States v. Gordon, 4 F.3d 1567, 1570 (10th Cir. 1993); Bethel v. United States, 458 F.3d 711, 717 (7th Cir. 2006), cert. denied, 549 U.S. 1151, 127 S. Ct. 1027, 166 L. Ed. 2d 774 (2007); United States v. Foster, 68 F.3d 86 (4th Cir. 1995). Indeed, it has been noted that

> [T]he sentencing consequences of guilty pleas (or, for that matter guilty verdicts) are extraordinarily difficult to predict. Although the sentencing guidelines significantly restrict the sentencing discretion of the district courts, that discretion is still extensive, and predicting the exercise of that discretion is an uncertain art. Therefore, . . . a mistaken prediction is not enough in itself to show deficient performance, even when that mistake is great[.]

McLachlan at 6, quoting Hughes, 2007 U.S. Dist. Lexis 19416, 2007 WL 841940 at *5, citing United States v. Barnes, 83 F.3d 934, 940 (7th Cir. 1996).

Petitioner's contention about counsel's lack of preparation and effort at his sentencing is easily disproven by the transcript of the sentencing hearing, where, after vigorously arguing his post-trial motions, counsel noted in open court that he had gone over the pre-sentence report "in great detail" with petitioner; petitioner did not deny it.[139] Counsel addressed petitioner's objections to the pre-sentence report in detail to petitioner's satisfaction;[140] and advocated on behalf of a sentence of probation for petitioner, instead of incarceration.[141] Upon a review of the sentencing transcript, the undersigned finds, as did the state habeas court, no evidence of ineffectiveness, let alone prejudice.

Petitioner's repetitive claim that counsel's failure to obtain experts, presumably a psychological expert, rendered any argument for probation . . . moot" has already been addressed *supra* and found to lack merit.

**13: The cumulative effect of all errors committed and adverse rulings made at trial violated petitioner's rights to due process and fundamental fairness.**

Because the undersigned, like the WVSCA in its October 22, 2012 Memorandum Decision,[142] finds no single error in the state court proceedings, it logically follows that there can be no cumulative error.

**15(b): The verdict form was erroneous and improper sentencing [occurred].**

Petitioner contends that the verdict form erroneously stated that the jury could find that he was guilty of sexual assault by a parent, guardian or custodian, as opposed to sexual abuse, arguing that "[a]lthough the error may be typographical . . .this discrepancy provides further support for the cumulative errors" committed at trial.

---

[139] Dkt.# 34-14 at 14.

[140] Dkt.# 34-14 at 11 – 14.

[141] Dkt.# 34-14 at 14 – 16.

[142] Dkt.# 34-9 at 4.

The state habeas court does not specifically address this claim, but the WVSCA found no error. Nor does the undersigned. The evidence was sufficient to find that petitioner had both sexually abused and sexually assaulted his stepdaughter, thus there was no error, let alone cumulative error.

Finally, as for petitioner's final claim that there was "improper sentencing," because he merely set forth those two words as a ground for relief without providing any fact or argument in support of the claim, it is so insufficiently pled it will not be given review.

**15(e) and 15(j): Petitioner was denied access to the Grand Jury minutes, impairing his ability to present additional grounds for his defense and the Grand Jury's composition was compromised.**

Petitioner claims that if only he had been granted access to the minutes of the Grand Jury, he and defense counsel would have had the opportunity to "present additional grounds for his defense" such as that the prosecutor did not "properly share the alleged victim's recantations to the grand jury." As for his challenge to the composition of the Grand Jury, petitioner's sole argument on this ground is that he "believes that the grand jury's composition was compromised. As such . . . the handing down of the indictment was improper." His reply to the respondent's dispositive motion, being merely a duplicate copy of his original memorandum, sheds no further light on this claim. The respondent's motion to dismiss does not address these claims at all.

Notice pleading is insufficient in federal habeas corpus. See Blackledge v. Allison, 431 U.S. 63, 75 n.7 (1977)(notice pleading is not sufficient, for the petition is expected to state facts that point to a 'real possibility of constitutional error'")(citation omitted). Further, Rule 2(c) of the Rules Governing Section 2254 Cases in the United States District Courts states that in addition to stating all grounds for relief, a petitioner must "state the facts supporting each ground."

The state habeas court framed this claim as petitioner's argument that he was improperly denied access to the grand jury minutes, and thus, it was his position the grand jury was not informed of the victim's recantation. Petitioner's repetitive claim that the victim recanted prior to the indictment has already been addressed *supra* and found to be without support in the record. The state habeas court noted that petitioner offered no evidence as to when the victim first recanted; no evidence that the composition

of the Grand Jury was improper; nor any cite to any authority to support his claim that the State had an obligation to inform the Grand Jury that the victim had recanted, concluding that petitioner had failed to establish a right to relief on both claims. Because petitioner has not even bothered to offer any facts from which this Court could construe a meritorious claim, the undersigned agrees. Relief should be denied.

## V. Recommendation

For the above-stated reasons, the undersigned recommends that the Court enter an Order **GRANTING** the defendant's Motion for Summary Judgment (Dkt.# 34) and **DENYING** the petitioner's §2254 motion (Dkt.# 1) and **DISMISSING** it from the Court's docket.

**Within fourteen (14) days** of being served with a copy of the **original** Recommendation, **or by December 2, 2013**, any party may file with the Clerk of the Court, written objections identifying the portions of the Recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the United States District Judge. **Failure to timely file objections to the Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Recommendation**. 28 U.S.C. §636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to provide a copy of this Amended Report and Recommendation to the *pro se* petitioner via certified mail, return receipt requested, and to transmit a copy electronically to all counsel of record.

The Clerk is further directed to terminate the referral of this action to the undersigned.

DATED: November 26, 2013.

                                       /s/ James E. Seibert
                                       JAMES E. SEIBERT
                                       UNITED STATES MAGISTRATE JUDGE